UNITED STATES of America,
Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

No. EP–06–CA–013–DB.

United States District Court,
W.D. Texas,
El Paso Division.

Sept. 26, 2007.

Joel McElvain, U.S. Department of Justice, Washington, DC, for Plaintiff.

C. Thomas Kruse, Jamie A. Joiner, Matthew W. Caligur, Baker & Hostetler, LLP, Houston, TX, David M. Murphy, Robert B. Silverman, Grunfeld, Desiderio, Lebowitz, Silverman, & Klestadt, LLP, New York, NY, Joseph L. Hood, Jr., Scott, Hulse, Marshall, Feuille, Finger & Thurmond, P.C., El Paso, TX, for Defendant.

### MEMORANDUM OPINION AND ORDER

DAVID BRIONES, District Judge.

On this day, the Court considered Defendant Ford Motor Company's ("Ford") "Motion To Dismiss," filed in the above-captioned cause on January 12, 2007. On February 15, 2007, Plaintiff United States of America ("Government" or "Plaintiff") filed an "Opposition To Defendant Ford Motor Company's Motion To Dismiss (Corrected Version)" ("Response"),[1] to which

---

**1.** The Response amended the Government's original document "Opposition To Defendant Ford Motor Company's Motion To Dismiss," previously filed on February 9, 2007.

Ford filed a "Reply To Plaintiff's Opposition To Defendant's Motion To Dismiss" ("Reply").

On March 6, 2007, the Court granted *amicus curiae* to the American Association of Exporters and Importers ("the AAEI"), and permitted leave to file a "Memorandum Of Law In Support Of Ford Motor Company's Motion To Dismiss." On March 28, 2007, the Government filed a "Response To Amicus Brief Of American Association Of Exporters And Importers," to which Ford filed a "Reply To Plaintiff's Response to Amici Briefs." On March 9, 2007, the Court granted *amicus curiae* to the Alliance of Automobile Manufacturers, Inc. ("the Auto Alliance"), and permitted leave to file a "Memorandum Of Law In Support Of Ford Motor Company's Motion To Dismiss." On March 28, 2007, the Government filed a "Response To Amicus Brief Of Alliance Of Automobile Manufacturers, Inc.," to which the Auto Alliance filed a "Reply Brief In Support Of Ford Motor Company's Motion To Dismiss," on April 16, 2007. Ford filed a "Reply To Plaintiff's Response to Amici Briefs," on May 11, 2007. After due consideration, the Court is of the opinion that Defendant's Motion should be denied as detailed below.

**BACKGROUND**

This case arises out of a dispute regarding regulations promulgated by the Government in implementing the North American Free Trade Agreement ("NAFTA"), entered into by the United States, Mexico, and Canada on December 17, 1992. *See* 19 U.S.C.A. § 3301, *et seq.* (West 2005 & Supp.2007). Because the Court presently considers Ford's Motion to Dismiss for failure to state a claim, uncontroverted facts are taken as true, and facts at issue are resolved in Plaintiff's favor. *See Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993).

In 1996, Ford imported thousands of automotive products from a Mexican company, Coclisa, S.A. de C.V. ("Coclisa"),[2] through the El Paso, Texas Port of Entry.[3] At the time of entry, Ford claimed preferential tax treatment for these imported goods.[4] The preferential tax treatment claim was based on Coclisa's NAFTA Certificates of Origin, which certified that the goods originated in a NAFTA country. The NAFTA Certificates of Origin at issue were prepared and completed by Ford employees, acting as agents of Coclisa.

On January 9, 2001, United States Customs and Border Protection[5] ("Customs") served Ford with an administrative summons demanding production of documents relating to the imported products by February 8, 2001.[6] Ford responded to the

2. At the time, Coclisa was a wholly-owned subsidiary of Ford.

3. The automotive products included air conditioners, radiators, compressors and electrical ignition parts.

4. Ford made two categorical claims. The first category was under the Harmonized Tariff Schedule of the United States ("HTSUS") subheading 9802.00.80 ("9802"). The second category came under the NAFTA. If an imported good qualifies for a preferential tax treatment, this allows the good to be taxed at a reduced amount or enter tax free. *See* 19 C.F.R. 181.1(s) (2007).

   Subsequently, Ford rescinded its 9802 election, lost the preferential tax treatment, and paid the appropriate tariffs. The instant case does not involve the 9802 claim.

5. Formerly known as United States Customs Service, Customs became an official agency of the United States Department of Homeland Security on March 1, 2003.

6. The Summons sought information regarding the origin and classification of the component parts to the automotive products to determine whether they qualified for preferential tax treatment. Specifically, the Government sought the following:

   (i) Bills of Materials ("BOM") specifying the components for the finished automotive "air conditioners," "radiators," "compres-

summons by filing written objections and refused to produce the records claiming that Customs sought records that do not constitute "entry records" as defined by 19 U.S.C. § 1509(a)(1)(A). Asserting its authority under title 19 U.S.C. § 1509(g), Customs issued a monetary penalty against Ford in the amount of $41,931,997, for Ford's refusal to turn over the records at issue. Subsequently, Ford petitioned for the amount to be remitted or substantially reduced. On August 9, 2005, Customs administratively mitigated the fine to a lesser amount of $21,642,481.[7] To date, Ford has not paid the penalty.

On January 11, 2006, the Government filed the instant suit seeking to collect a civil penalty from Ford in the amount of $41,931,997, for failing to comply with the January 9, 2001 summons for records relating to the entry of certain merchandise into the United States. The Government claims that 19 U.S.C. § 1509(a)(1)(A) requires Ford, as the importer, to maintain certain records for entry of the imported products. The Government further contends that Ford was required to produce the records in compliance with the January 9, 2001 summons and that Ford's refusal authorized Customs to impose and collect the monetary penalty. The instant Motion followed.

## STANDARD

Rule 12(b)(6) allows dismissal of a case when the plaintiff fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). Under Rule 12(b)(6), a court must decide whether the facts al-

leged, if true, would entitle the plaintiff to some legal remedy. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Dismissal for failure to state a claim is highly disfavored and is not granted routinely because of the liberal "notice pleading" requirements of the Federal Rules. FED.R.CIV.P. 8(a); *see also Test Masters Educ. Servs. v. Singh,* 428 F.3d 559, 570 (5th Cir.2005). In short, a court should not dismiss a claim under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99.

When considering a motion under Rule 12(b)(6), the court must limit its inquiry to facts stated in the plaintiff's complaint and the documents either attached to or incorporated therein. *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996). Federal courts may take judicial notice of matters of public records on a Rule 12(b)(6) motion. *Test Masters Educ. Servs.,* 428 F.3d at 570 n. 2. Further, the court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them, *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), and "must review those facts in the light most favorable to the plaintiff." *Green v. State Bar of Tex.,* 27 F.3d 1083, 1086 (5th Cir.1994). However, the court need "not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."

---

sors," and "electrical ignition parts" that Ford purchased and imported from Coclisa in 1996;
(ii) NAFTA Certificates of Origin, "manufacturer's affidavits and/or other documentation to substantiate the origin of each component listed" in Coclisa's BOMs; and
(iii) "the HTSUS number" utilized in the classification of each component listed in Coclisa's BOMs.

**7.** The amount of the mitigated penalty was effective for a period of sixty (60) days; Ford's failure to tender payment resulted in the reinstatement of the full amount. *See* 19 C.F.R. § 172.21 (2007).

*Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir.2005).

## DISCUSSION

Through its Motion, Ford argues that Customs sought records that do not qualify as § 1509 "entry records," and, therefore, the Government lacks authority to impose and enforce the fine for Ford's refusal to comply with the summons. Specifically, Ford posits the records at issue are "Foreign Producer Records," and that Coclisa, as the exporter, was solely responsible to maintain them. Alternatively, Ford contends that even if the records do constitute § 1509 entry records, that statutory definition must yield to conflicting definitions found in regulation and agency manuals. In its Response, the Government counters that the records at issue qualify as "supporting documents" to the NAFTA Certificates of Origin, and are expressly defined as entry records. The Government also responds that Ford's cited authority does not directly contradict the definition of § 1509 entry records. Next, the Government contends it may collect the fine in light of Ford's refusal to comply with its summons to produce the entry records.

In its Reply, Ford retorts that "entry records" is a narrow subset of records, limited to only four (4) types of documents. Finally, Ford argues that the Government has advanced an incorrect standard to define entry records by confusing the distinction between § 1509 entry records and § 1508 business records. The Court finds Ford's arguments unconvincing and addresses each argument in turn.

## A. The Summonsed Records

### 1. Statutorily Defined Entry Records

First, Ford argues that the records at issue fall outside the scope of defined entry records because they are not "required by law for entry." Rather, Ford states that the records at issue are appropriately described as "Foreign Producer Records," created by the exporter, and, most importantly, are only to be maintained by the exporter. Ford further contends that "entry records" is a narrow classification of documents that is limited to only four (4) types of forms. The Government responds that Ford ignores the plain reading of the regulation, which expressly defines the records at issue as entry records. The Court agrees with the Government.

United States' tariff laws grant preferential tax treatment to products originating in a NAFTA country. *See Cummins Inc. v. United States*, 454 F.3d 1361, 1361–62 (Fed.Cir.2006) (citing 19 U.S.C. § 3332 (2000)). In order to receive tax benefits under the NAFTA, importers must tender a written declaration that the goods qualify for the NAFTA tax benefit. 19 C.F.R. § 181.21(a) (2007). The written declaration is based upon and supported by a NAFTA Certificate of Origin.[8] 19 C.F.R. § 181.21(a). Customs is charged the duty to examine any record relating to the importation of merchandise, to ascertain the tax liability of the importer, and to ensure compliance with the laws of the United States. 19 U.S.C.A. § 1509(a) (West 1999). Customs may order the production of any such records by an administrative summons[9] and may impose a variety of

---

**8.** A Certificate of Origin is the document which certifies that a good being exported from Mexico into the United States qualifies as an originating good under the NAFTA. *See* 19 C.F.R. § 181.11(a).

The exporter or producer of goods is responsible for issuance of the NAFTA Certificate of Origin. *See* 19 C.F.R. § 181.11.

**9.** Specifically, § 1509(a)(1)(A) delineates that entry records must be produced within a reasonable time following a demand by Customs. *See* 19 U.S.C.A. § 1509(a)(1)(A); *see also* 19 C.F.R. 163.6(a) (requiring production within thirty (30) days of demand).

penalties for an importer's non-compliance. 19 U.S.C.A. §§ 1509(a) & (g); 19 C.F.R. § 163.6 (2007).

■ The records subject to an administrative summons are strictly limited to those required to be kept by law. *United States v. Rubin*, 2 F.3d 974, 977 (9th Cir. 1993); *United States v. Frowein*, 727 F.2d 227, 233 (2d Cir.1984). Section 1509 specifically authorizes Customs to summons "entry records." 19 U.S.C.A. § 1509(a)(1). "Entry records" refers to records that are required by law for the entry of merchandise. 19 C.F.R. § 163.1(f); *see also* 19 C.F.R. 141.0a(a) (2007). Customs is also charged with the duty to identify and publish a list that itemizes the information and records which qualify as entry records. 19 U.S.C.A. § 1509(e). In accordance with that directive, that list, commonly referred to as the "(a)(1)(A) list," appears in the appendix to 19 C.F.R. § 163.[10]

#### a. *Plain Reading of the Law*

By definition, the "(a)(1)(A) list" identifies those documents which are required by law for the entry of goods. *See* 19 C.F.R. § 163.1(f). Accordingly, the records included on the list do constitute entry records. The "(a)(1)(A) list" itemizes numerous records for the various categories of merchandise; section IV of the list itemizes the entry records for special categories of goods including NAFTA qualifying goods. *See* 19 C.F.R. § 163 app. The relevant portion of the regulation reads in conspicuous, bold-face print: " § **181.22 NAFTA Certificate of origin and supporting records.**" *See* 19 C.F.R. § 163 app. § IV. (emphasis in original). It is undisputed that the NAFTA Certificate of Origin is an entry record. Thus, the appropriate classification of the records at issue depends upon the scope of the modifier "and supporting records."

Support is defined as "to hold up or serve as a foundation or prop." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed.1996). The NAFTA Certificate of Origin is the executive summary certifying that the merchandise qualifies as originating goods. 19 C.F.R. § 181.11. In that regard, supporting records are those documents that serve as the foundation by which the exporter executes a NAFTA Certificate of Origin. Hence, the supporting records would provide information relating to the origin of the goods.

Here, the substantive information contained in the records at issue is undisputed. The records at issue provide information relating to the component parts of the imported goods. Specifically, the records at issue would show the country from which the component parts originated. That information is critically important, as without it, a NAFTA Certificate of Origin could not be prepared for the merchandise. In turn, the imported goods would not qualify for the NAFTA preferential tax treatment. It is axiomatic that the records at issue qualify as supporting documents to the NAFTA Certificates of Origin. Additionally, Ford concedes that the records at issue serve to validate the NAFTA Certificates of Origin for the imported goods.[11]

Next, Ford describes the records at issue as "Foreign Producer Records," arguing that the entity solely responsible for maintaining them is the exporter. In sup-

---

**10.** Customs has drafted a comprehensive list that includes general requirements and specific records for special categories of products. *See* 19 C.F.R. § 163 app.

**11.** In fact, Ford's Motion refers to the records at issue as "supporting records" and claims that the only reference to supporting records is found in agency manuals under procedural sections for origin verification audits. This assertion is inaccurate as supporting records are identified in the "(a)(1)(A) list" and under 19 C.F.R. § 181.12(a).

port of its contention, Ford cites to 19 C.F.R. § 181.12.[12] Ford is correct that exporters are statutorily required to maintain these supporting records. *See* 19 C.F.R. § 163.2(c); 19 C.F.R. § 181.12(a). However, this requirement does not alter the classification of the records as entry records, nor does the regulation relieve the importer of its duty to maintain said records. *See* 19 C.F.R. § 163.2(a)(1)(I). Rather, Customs may expressly subject the importer to Custom's summons authority, 19 U.S.C.A. § 1509(a)(2)(A)(i), and impose a monetary penalty for refusing to turn over entry records. 19 C.F.R. § 163.6(b). Similarly, the regulation assigns an additional record-keeping requirement upon the exporter, subjecting the exporter to the same record-keeping requirements imposed upon the importer. *See* 19 C.F.R. § 163.2(c);19 C.F.R. § 181.12(a).

■ Further, the fact that the exporter created the supporting records is irrelevant to their classification. For example, the exporter of merchandise is required to draft the NAFTA Certificates of Origin. Both the Government and Ford recognize Coclisa issued the NAFTA Certificates of Origin in this case.[13] Nevertheless, this document is indisputably classified as an entry record, and, thus, supporting records may be classified as entry records despite which entity created the documents. In that regard, it is not dispositive that Customs did not request Ford to produce the supporting documents at the moment of entry. Customs may summons any entry record whether or not it demanded inspec-

tion of those entry records at the time of entry. 19 C.F.R. § 163.1(f) (recognizing entry records as such, irrespective of whether "Customs required their presentation at the time of entry"). The Court finds that the records at issue are "supporting records" that relate to the importation of the automotive products, as defined under the "(a)(1)(A) list." Thus, the Court is of the opinion that the records at issue are required by law for the entry of goods, and are defined as "entry records."

Additionally, § 181.12(a) bolsters a finding that supporting documents are to be deemed entry records. Not only must the exporter keep the NAFTA Certificates of Origin, but they are expressly required to maintain "all other records relating to the origin of a good" for NAFTA preferential tax treatment. *See* 19 C.F.R. § 181.12(a). Although this language is not identical to the "and supporting records" language found in the "(a)(1)(A) list," both describe the same substantive information. Ultimately, this information would qualify imported products for NAFTA preferential tax treatment. Therefore, the Court is of the opinion that the records at issue do constitute "entry records," and the exporter's duty to maintain entry records is in addition to Ford's record-keeping requirement.

Ford then argues that entry records are so narrowly defined that the following four (4) documents are the only entry records subject to being summonsed: 1. a commercial invoice; 2. a bill of lading; 3. a packing slip; and 4. a NAFTA Certificate of Ori-

---

**12.** § 181.12. Maintenance and availability of records.

    (a) *Maintenance of records*—(1) *General.* An exporter or producer in the United States who completes and signs a Certificate of Origin shall maintain in the United States, for five years after the date on which the Certificate was signed, the Certificate (or copy thereof) and all other records re-

lating to the origin of a good for which preferential tariff treatment may be claimed in Canada or Mexico....

    19 C.F.R. § 181.12(a).

**13.** Ford concedes that it prepared the NAFTA Certificates of Origin, and likewise, that Coclisa was a wholly-owned, Ford subsidiary at the time of importation.

gin. Ford's narrow construction in defining entry records is inaccurate. The "(a)(1)(A) list," printed in the appendix to 19 C.F.R. § 163, is approximately four pages in length. Under the first category, Customs has itemized six separate records as the entry records generally required for the majority of entries. *See* 19 C.F.R. § 163 app. § I. The list also establishes various documentation requirements according to the classification of the merchandise. *See* 19 C.F.R. § 163 app. § IV. As noted above, the "(a)(1)(A) list" specifically requires additional entry records for NAFTA qualifying goods. *See* 19 C.F.R. § 163 app. § IV. Thus, the Court is of the opinion that the information and records itemized on the "(a)(1)(A) list" constitute entry records, that Ford's narrow construction is inaccurate, and that Ford's motion should be denied.

### b. Relation between "Origin" and "Entry" under the NAFTA

Ford also argues that there is a distinction between records that relate to "importation" and records that relate to the "origin" of goods, concluding that "origin records" are not required by law for entry of merchandise. While Ford proffers the argument without extensive analysis, *amicus curiae* the Auto Alliance provides an in-depth discussion that bolsters Ford's argument in favor of finding this distinction is dispositive. The Government responds that the differences identified by Ford and the Auto Alliance do not establish mutually exclusive categories. The Court finds Ford's argument unconvincing.

Ford and the Auto Alliance do not dispute that the records at issue are supporting records; however, they reason that a fundamental difference exists between "origin" and "importation" records. Specifically, Ford and the Auto Alliance argue that records pertaining to "importation" of goods must be maintained by importers.

Conversely, records relating to the merchandise's "origin" must be maintained by the exporter. According to the Auto Alliance, "origin" refers to activities that occur in the course of production of the merchandise, whereas "importation" refers to the transaction itself-the processes by which an importer purchases and takes delivery of the merchandise. The Auto Alliance deduces that as Customs summonsed information regarding the component parts to the merchandise, the records at issue relate to "origin" of goods and, therefore, cannot be classified as entry records.

While phrased in a novel manner, the Auto Alliance's argument fails to recognize the interdependent relationship that exists between "origin" and "importation," and the dual purpose served through certain entry records. The Court finds the *Rainbow Rugs* opinion instructive on this point. *United States v. Rainbow Rugs*, 838 F.Supp. 11 (D.Me.1993). In *Rainbow Rugs*, Customs sought enforcement of an administrative summons under Title 19 U.S.C. § 1508, to examine records that contained information on the value of certain imported goods. *Id.* at 12–13. The district court discussed the nexus between the term "valuation" and "importation," and held that records indicating the value of goods pertained to the importation of those goods. *Id.* at 14. Further, a nexus existed because the importer was required to declare the value of the goods at the time of entry. *Id.* at 14–15. A parallel can be drawn from *Rainbow Rugs* on this point.

As noted above, the records at issue provide information concerning the origin of the goods. Under the NAFTA, the importation of merchandise greatly depends upon origin records. *See* 19 C.F.R. § 181.23(a). Any NAFTA importer must tender a written declaration as to the orig-

ination of the goods. 19 C.F.R. § 181.21(a). Any imported good will be denied preferential tax treatment without certification of its origin, including origin of its component parts. *See* 19 C.F.R. § 181.23(a). The relationship between "origin records" and "importation" of goods goes beyond a mere nexus. Rather, the NAFTA regulations engender a dependent relationship, an almost causal connection, between "origin" and "importation." Therefore, the Court determines that the distinction between "origin" and "importation" under the NAFTA is not dispositive to the instant case.

Second, a NAFTA Certificate of Origin certifies that the imported goods qualify as originating goods. *See* 19 C.F.R. § 181.11. Using terms provided by the Auto Alliance, the NAFTA Certificate of Origin summarizes information regarding the production of the imported goods. The NAFTA Certificate of Origin does not furnish information concerning transactional delivery of the goods. In effect, this document serves as an executive summary of the production of the merchandise. Under the Auto Alliances's definition, this document should not be required by law for entry. However, the NAFTA Certificate of Origin is indisputably classified as an entry record. 19 C.F.R. § 163 app. § IV. The inclusion of NAFTA Certificates of Origin on the "(a)(1)(A) list" evinces that information relating to the origin of goods is required by law for the entry of those goods. Therefore, the Court finds that a single document may be classified as an entry record while appertaining to "origin" information. Further, the Court determines that the importation of NAFTA goods is inextricably intertwined with the origin of the goods and that Customs properly sought records relating to the importation

of the automotive goods. Thus, the Court finds that the records at issue do constitute "entry records," and that Ford's Motion should be denied.

### 2. Ford acting as Coclisa's Agent

Additionally, the Court notes that Ford completed and signed the NAFTA Certificates of Origin on behalf of Coclisa in the instant case. While Ford claims this fact is irrelevant, the Court believes it lends support to the Government's argument. Irrespective of whether Coclisa, as the exporter of the automotive goods, is responsible for issuing and maintaining the NAFTA Certificates of Origin; Ford assumed those duties here when it acted as Coclisa's agent.

Ford indicated that preparation of the NAFTA Certificates of Origin required an individual with extensive knowledge of the comprehensive nature of NAFTA regulations. Apparently, Coclisa did not employ such an individual and enlisted Ford personnel to complete the NAFTA Certificates of Origin for the automotive goods. Here, only Coclisa or Ford could have signed the document to properly execute the NAFTA Certificate of Origin. *See* 19 C.F.R. § 181.22(b)(2) (stating that the Certificate "shall be signed by the exporter or by the exporter's authorized agent"). NAFTA regulations require the preparer to have either personal knowledge, or have actually relied upon other documentation substantiating that the goods qualified as originating goods. *See* 19 C.F.R. § 181.11(b). These documents, upon which the preparer relies, would constitute "supporting records" as they are the foundation by which Ford completed the NAFTA Certificate of Origin. In turn, these records do constitute "entry records." In essence, Ford, as Coclisa's agent,[14] must

---

**14.** The Court finds that the agent of the exporter must maintain records in the same manner as the exporter. *See, e.g.,* 19 C.F.R.

§ 163.2(a)(2) (requiring the agent of the importer to maintain records in the same manner as the importer).

have had access to the supporting records while completing the NAFTA Certificates of Origin. Further, Ford should have maintained those documents in its regular course of business to support its issuance of the NAFTA Certificates of Origin. *See* 19 C.F.R. § 163.3. Accordingly, Ford is required to maintain these records in the same manner as Coclisa.

In addition, the record tends to show that the component parts to the automotive goods originated from the United States and were exported by Ford to Coclisa, into Mexico. The NAFTA places an additional record keeping requirement upon United States' exporters to maintain supporting records in an identical manner as is required of importers. *See* 19 C.F.R. § 163.2(c). Originally, Ford made two separate claims for preferential tax treatment for the automotive goods. At a later date, Ford rescinded its first claim, a "9802" claim, stating that it did not have the appropriate supporting documentation.[15] The Court agrees that the "9802" claim is not at issue in the instant case. However, this fact tends to support the evidence that Ford originally exported the component parts from the United States. In that transaction, Ford was required to maintain the documents showing the origination of the component parts. *See* 19 C.F.R. § 181.11(a). Those documents would serve as the supporting records for the NAFTA Certificates of Origin in the instant case. Therefore, the Court finds that Ford is required to maintain the records at issue as entry records, and that Ford's Motion should be denied.

## 3. 1508 Business Records vs. 1509 Entry Records

In its Reply, Ford argues that the Government confuses the distinction between § 1509 entry records and § 1508 business records, and incorrectly advises the Court to apply the business records standard to the instant case. The Government does not respond to this argument. Contrary to Ford's position, *amicus curiae* the AAEI, directly advances the § 1508 business record standard and argues for its application in the instant case. The Court agrees with Ford that the business records standard is not applicable to the instant case.

Customs may demand production of § 1508 business records for examination through its summons authority under § 1509. 19 U.S.C.A. § 1509(a)(2); *see* *Rubin*, 2 F.3d at 977. Under § 1508, an importer of goods must produce records which satisfy a two-prong statutory test: (1) records that "pertain" to the importation of said goods; and (2) "are normally kept in the ordinary course of business." *Rubin*, 2 F.3d at 976–77; *Rainbow Rugs*, 838 F.Supp. at 13.

While entry records and business records share certain similar characteristics, significant distinctions make the latter inapplicable to the instant case. *Rubin*, 2 F.3d at 977. Comparatively, both § 1509 entry records and § 1508 business records are subject to Customs' summons power. *See* 19 U.S.C.A. §§ 1509(a)-(b); *Rubin*, 2 F.3d at 977. Further, the records share similar language which serves as a functionally equivalent definition.[16]

---

**15.** A "9802" claim is premised on the assertion that the goods were assembled in a foreign country from components originating in the United States, thereby qualifying the goods for preferential tax treatment apart from the NAFTA election. 19 C.F.R. § 10.13.

**16.** *Compare* 19 C.F.R. § 163.1(a)(1) ("The term 'records' means any information made or *normally kept in the ordinary course of*

*business* that pertains to any [entry].") *and* 19 C.F.R. § 163.3 ("Entry records which *are normally kept in the ordinary course of business* must be maintained by such person in accordance with [part 163] …") *with* 19 U.S.C.A. § 1508(a)(3)(B) (listing those persons who "shall make, keep and render for examination and inspection records … which … are

However, § 1509 establishes a stricter standard for entry records. Section 1508 establishes a two-prong standard, *See* 19 U.S.C.A. § 1508(a), while § 1509 entry records are limited to those documents enumerated in the appendix to 19 C.F.R. § 163. *See* 19 C.F.R. § 163 app. The first prong in the § 1508 standard has been interpreted to be more inclusive, rather than restrictive, in nature. *See Rainbow Rugs*, 838 F.Supp. at 14. Indeed, under § 1508, a party need only show "some connection, even if weak," between the documents and the subject matter. *Id.* In contrast, an entry record cannot be loosely defined; rather, only those documents listed on the "(a)(1)(A) list" may constitute an entry record.

Further, the penalty provisions for each section constitute the most important distinction between § 1508 and § 1509. The penalty for refusal to produce § 1509 entry records authorizes Customs to impose an administrative fine *See* 19 C.F.R. § 163.6(b), the same penalty is impermissible under § 1508. As seen in *Rubin* and *Rainbow Rugs*, the Government was limited to seek judicial enforcement of its summons to remedy an importer's refusal to turn over § 1508 business records. *See Rubin*, 2 F.3d at 975; *Rainbow Rugs*, 838 F.Supp. at 12. A monetary penalty could not be issued until the importer fails to comply with a court order demanding submission. *See* 19 C.F.R. § 163.10(a). In contrast, an importer's refusal to comply with a § 1509 entry record summons is punishable by an administrative fine, bypassing the need for judicial intervention. *See* 19 U.S.C.A. § 1509(g). The decision to vest greater penal authority for one category of records rather than another carries with it an implicit finding that the former is a more stringent standard.

Nonetheless, simply because the two categories exhibit similarities does not ar-

gue in favor of governmental imposition of an administrative fine under § 1508. Assuming, *arguendo*, the Government petitioned the Court to adopt the § 1508 two-prong test, the Court declines to apply it as the instant case was brought to collect a monetary penalty under § 1509 authority. The Court determines that *Rubin* and *Rainbow Rugs* opinions are instructive; however, the instant case is distinguishable for the simple fact that § 1508 is not at issue here.

### 4. Relation of Entry Records List to Other Statutes and Regulations

Alternatively, Ford asserts that two internal Customs agency manuals define "entry records" in a manner that directly conflicts with the definition of § 1509 entry records, which requires the Court to apply the definitions provided in the manuals. Specifically, Ford argues that despite a finding that the records at issue qualify as § 1509 entry records, that statutory definition must yield to the conflicting definition found in the *North American Free Trade Agreement Focused Assessment Program Guidelines* ("*NAFTA Assessment Guidelines*"), the *North American Free Trade Agreement Audit Verification Manual* ("*NAFTA Audit Manual*"), and verified under 19 C.F.R. § 181.72(c). The Government concedes that § 1509 requires the "(a)(1)(A) list" to yield to conflicting law, but argues that Ford's identified manuals do not directly contradict the definition of entry records. The Court agrees with the Government.

Ford proffers two Customs manuals, arguing that they expressly prohibit imposition of the penalty and are contrary to the "(a)(1)(A) list." The *NAFTA Audit Manual* relates to the procedures by which Customs conducts an audit of the exporter of goods. *See* UNITED STATES CUSTOMS AND

*normally kept in the ordinary course of busi-*        *ness.") (emphasis added).*

Border Protection, North American Free Trade Agreement (NAFTA) Verification/Audit Manual, Chs. 1, 5, http://www.cbp.gov/xp/cgov/import/international_agreements/free_trade/nafta/verification_audit_manual/ (last visited Sept. 24, 2007), *available at* http://www.lb5.uscourts.gov/Resources/ArchivedURLs/. While an audit and an examination of records are similar in nature, in that they ultimately seek the same information, the two terms do not govern the same procedure and are inapposite. *Compare* 19 U.S.C.A. § 1509(a) with 19 U.S.C.A. § 1509(b) (categorizing procedures for examination of records and regulatory audits).[17] An audit is conducted to determine "that information submitted or required is accurate, complete and in accordance with laws and regulations administered by Customs." 19 C.F.R. § 163.1(c). An audit is not conducted upon the importer, but is a secondary procedure that commences upon the exporter after an initial determination that the importer's records cannot support the preferential treatment claim. United States Customs and Border Protection, Focused Assessment Program (FAP) Documents, Exhibit 5V: North American Free Trade Agreement (NAFTA) Technical Information For Pre-Assessment Survey (TIPS) § 1.4 (2003), http://www.cbp.gov/xp/cgov/import/reg_audit/focused_assessment/fap_documents/ (last visited Sept. 24, 2007), *available at* http://www.lb5.uscourts.gov/Resources/ArchivedURLs/.

Further, the *NAFTA Verification/Audit Manual* does not directly relate to an importer's duty to keep NAFTA supporting records, but only discusses the exporter's duty. In turn, Ford argues that the lack of direction on the investigation processes as to importers creates an inference that importers are not required to maintain supporting records. Assuming, *arguendo,* Ford's argument holds merit, it remains merely an inference without direct authority. The *NAFTA Verification/Audit Manual* contains no language which makes maintenance of records the exclusive province of the exporter. Thus, the Court finds there is no direct conflict which negates or rebuts the "(a)(1)(A) list" definition on "entry records."

■ Nevertheless, the *NAFTA Assessment Guidelines* directly challenges and contradicts the "(a)(1)(A) list." Under the heading of "Red Flags," the manual states: "The importer is not responsible to maintain documentation that will support the origination of the goods that is certified by the exporter on the NAFTA [Certificate of Origin]." *See* Focused Assessment Program (FAP) Documents, Exhibit 5V: North American Free Trade Agreement (NAFTA) Technical Information For Pre-Assessment Survey (TIPS) § 2.2. While Ford has identified a direct conflict, an agency's internal guidelines and manuals do not have the equivalent force of law as a federal statute or regulation. *See Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 748, 124 S.Ct. 2230, 159 L.Ed.2d 46 (2004). Title 19 U.S.C. § 1509 directs the "(a)(1)(A) list" to yield only to a federal statute and regulation-which internal guidelines are not. Therefore, the Court determines that because internal agency manuals are not federal statutes and regulations, conflicting definitions do not exist, and the "(a)(1)(A) list" is the authoritative definition of entry records.

Correspondingly, Ford maintains that the manuals are in conformity with and validated by 19 C.F.R. § 181.72. Section 181.72(c) stipulates that the non-production of supporting records cannot result in a denial of preferential tax treatment for the

17. Federal regulations permit Customs to perform various types of examinations: an investigation or compliance assessment, audits or other inquiries. *See, e.g.,* 19 C.F.R. § 163.6(c)(1).

imported goods. *See* 19 C.F.R. § 181.72(c). The regulation expressly proscribes Customs from collecting tariffs for a non-qualifying NAFTA good. *See* 19 C.F.R. § 181.72(c). However, § 181.72(c) does not contain language prohibiting Customs from imposing a monetary penalty for the non-production of records. *See* 19 C.F.R. § 181.72(c). Further, this section does not directly define entry records, nor does the section indicate that the importer is relieved from maintaining entry records. The Court finds that the refusal to produce the supporting records results in a separate and distinct penalty than what is limited through § 181.72(c), and, therefore, no conflict exists between the two regulations that would require the "(a)(1)(A) list" to yield to § 181.72(c). Thus, the Court is of the opinion that a conflict between the "(a)(1)(A) list" and another federal statute or regulation does not exist. Therefore, the Court is of the opinion that Ford was statutorily required to maintain and produce the records at issue and that the instant Motion should be denied.

**B. Penalty Assessment**

Next, Ford contends that because the January 9, 2001 summons sought documents that do not constitute entry records, the Government has no authority under § 1509 to impose a monetary penalty. Further, Ford states that the Government's only recourse was to file suit to enforce the January 9, 2001 summons, rather than suit to collect the impermissibly imposed fine. For the reasons discussed above, the Court finds Ford's argument unconvincing.

Ford's second argument assumes that the summonsed records are not entry records. As discussed above, the documents sought by the January 9, 2001 summons fall within the scope of entry records, rendering Ford's final argument without merit. It is axiomatic that because Customs sought production of entry records, it also had the authority to impose a monetary penalty for Ford's refusal to produce those entry records. *See* 19 U.S.C.A. § 1509(g). The Court determines that as Customs sought entry records, Ford's refusal to produce the records at issue authorized the imposition of the monetary penalty in this case. Thus, the Court finds that Ford has not demonstrated beyond a doubt that the Government cannot prove any set of facts which would entitle it to relief. Therefore, the Court is of the opinion that Ford's Motion to Dismiss must be denied.

CONCLUSION

For the reasons stated above, the Court finds that Plaintiff has pled sufficient facts which may entitle it to relief. The January 9, 2001 summons sought records which are expressly defined as entry records, specifically defined as the NAFTA Certificate of Origin supporting records. Next, the Court finds that Ford has not identified a federal statute or regulation which directly contradicts the definition of entry records under § 1509. Similarly, the "(a)(1)(A) list" cannot be contradicted by Customs' internal manuals, and thus, the records at issue are appropriately defined as entry records. As the Court finds the records at issue fall under the scope of the "(a)(1)(A) list," it follows that Customs has the authority to impose and collect the monetary penalty for Ford's refusal to comply with the January 9, 2001 summons. Here, Ford has failed to demonstrate beyond a doubt that the Government can prove no set of facts which may entitled it to relief. Therefore, the Court is of the opinion that Defendant's Motion should be denied.

Accordingly, **IT IS HEREBY ORDERED** that Defendant Ford Motor Company's "Motion To Dismiss" is **DENIED.**